*11854*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- x

NEW YORK CONTAINER TERMINAL, LLC,
successor by merger with
NEW YORK CONTAINER TERMINAL, INC.,



        Petitioner,

    v.

SOUTH PACIFIC SHIPPING CO., LTD.,
d/b/a ECUADORIAN LINE,

        Respondent.

-------------------------------------------------------- x

Case Number:

**~~VERIFIED PETITION~~**
**TO STAY ARBITRATION**

Petitioner, **NEW YORK CONTAINER TERMINAL, LLC**, successor by merger with

**NEW YORK CONTAINER TERMINAL, INC.** (hereafter "**NYCT**"), by and through its

attorneys, JUNGE & MELE, LLP, alleges the following as and for its Verified Petition to Stay

Arbitration:

## INTRODUCTION

This is an action to invoke the District Court's inherent jurisdiction to bar Respondent from

further prolonging an already protracted ongoing arbitration proceeding. Respondent recently

commenced a rival arbitration, in a transparent attempt at forum shopping, in order to circumvent

a final resolution of an arbitration which has been proceeding pursuant to the Rules of the Society

of Maritime Arbitrators ("SMA") for more than three years.

## JURISDICTION & VENUE

1.   This case involves admiralty and maritime claims within the meaning and intent of

Rules 9(h) and 38(e) of the federal Rules of Civil Procedure, which arise from disputes regarding

1

ED HICKEY   1-14-11

a stevedoring contract currently being arbitrated before a panel of the Society of Maritime Arbitrators (hereafter "SMA Arbitration"), and as such, subject matter jurisdiction exists pursuant to 28 U.S.C. § 1333(1); an alternative basis of subject matter jurisdiction exists under 28 U.S.C. § 1332(a), as there is diversity of citizenship between the parties and the amount in controversy exceeds $75,000 exclusive of interest and costs, as well as 28 U.S.C. §1331, and based upon the treaty provisions under 9 U.S.C.§ 201, *et seq.*.

2.      Venue in this district is proper pursuant to §§ 4 and 204 of the Federal Arbitration Act, 9 U.S.C. § 1, et seq., and § 201, et seq. (the "New York Convention."), as well as a valid forum selection clause contained in the stevedoring contract subject of the SMA Arbitration.

## PRELIMINARY STATEMENT

3.      NYCT and Respondent, South Pacific Shipping Co., Ltd., d/b/a/ Ecuadorian Line (hereafter "South Pacific" and intermittently referred to as "Ecuadorian Line" and "ECL")), have been arbitrating their contractual disputes in SMA Arbitration since August 7, 2007, during which time they submitted pre-arbitration briefs, exchanged thousands of documents in discovery,  took testimony from 13 live witnesses in 15 hearings, and are due to submit post-hearing briefs on January 19, 2010.

4.      Despite the fact that it actively participated  in the pending SMA Arbitration for nearly 3½ years and  a decision from the SMA panel is now imminent, Respondent recently commenced a parallel arbitration before the American Arbitration Association ("AAA") on December 16, 2010, asserting claims which are identical to those presently  under consideration by the SMA Panel.

5.      As will be more fully set forth herein, the AAA arbitration should  be permanently

or temporarily stayed given that it constitutes an improper attempt to circumvent the authority of an ongoing arbitration pursuant to SMA Rules, and as such, is a clear violation of Federal law, New York law, the parties' arbitration agreement, and the Rules of the Society of Maritime Arbitrators; additionally, a substantial number of South Pacific's claims set forth in its AAA arbitration demand are time barred under applicable statutes of limitation and must be dismissed.

## PARTIES

6.      NYCT, a New York limited liability company, with its offices located at 300 Western Avenue, Staten Island, New York, is a stevedore and terminal operator which operates the "New York Container Terminal" (previously known as the "Howland Hook Container Terminal") in Staten Island.

7.      Upon information and belief, Respondent, South Pacific, is a Bermuda Corporation located at Charlotte House, Charlotte St., Nassau Bahamas, as well as at the New York Container Terminal, which owns and operates ships that transport bananas and other fresh fruit to the United States and destinations worldwide.

## ARBITRATION AGREEMENT

8.      On or about April 29, 1997, NYCT's predecessor, Howland Hook Container Terminal, Inc,. entered into a stevedoring agreement ("Agreement") with South Pacific, under which it agreed to discharge and handle cargoes of fresh fruit from vessels owned or operated by South Pacific. *Exhibit 1.*

9.      Section XVII of the Agreement provides the following:

It is agreed by the parties to this agreement that **the laws of the State of New York shall be applicable to and govern all claims, actions or disputes that may arise under this agreement.**

3

**All disputes arising under this Agreement shall be arbitrated in New York, New York.** One arbitrator shall be appointed by each of the parties hereto and a third by the two so chosen. Their decision, or that of any two of them, shall be final and, for the purpose of enforcing any award, this Agreement may be made a rule of the court. **The arbitrators shall be commercial people, conversant with shipping matters.** The arbitration shall be conducted in accordance with the rules of the Society of Maritime Arbitrators Inc., or the American Arbitration Association, as selected by the party commencing the arbitration.

For disputes where the total amount claimed by either party does not exceed US$100,000, the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society of Maritime Arbitrators Inc. or the American Arbitration Association, as selected by the party commencing the arbitration.

**In connection with the enforcement of this clause and any arbitration award, Carrier hereby agrees to submit to the jurisdiction of the Courts of the State of New York, including the United States district Courts located in New York,** and appoints Ecuadorian Line Inc., a Delaware corporation with offices in New York, as its agent for the service of legal process in New York. Nothing contained herein shall be construed as depriving contractor of any other rights it may have against Carrier or its vessels at law, in admiralty, or in equity as a result of any breach by Carrier of its obligations hereunder.

Id. (emphasis supplied).

10.     After entering into the original Agreement, the parties entered into various amendments/exhibits thereto, denominated as "Confidential Rate Schedule for Ecuadorian Line, " the last of which was effective October 1, 2005 and was agreed to in October 2006. *Exhibit 2.*

## PRELIMINARY INJUNCTION

11.     In or about July, 2007, disputes arose between the parties concerning the fact that South Pacific abruptly changed the class of vessels and nature of operation at New York Container Terminal for the prior seven (7) years.

12.     On July 10, 2007, South Pacific, along with its affiliate, Pacific Fruit, Inc., commenced an action in this court, bearing case number 07 Civ. 6317, seeking a preliminary

injunction enjoining NYCT from not servicing South Pacific's vessels at the terminal pending a resolution of the parties' disputes.

13.     While the preliminary injunction motion was pending, NYCT initiated the SMA Arbitration pursuant to Section XVII of the Agreement on August 7, 2007, and nominated David B. Lettany as Arbitrator.

14.     On August 14, 2007, then District Judge Gerard Lynch granted the preliminary injunction in a ruling from the bench, wherein he stated the following:

> ...There is now a preliminary injunction in place. I am sensitive to the fact that that injunction does require the defendant to do things that will be costly or difficult for the defendant; and, therefore, it seems important to try to expedite whatever is necessary to finally resolve the litigation. There is an issue as to the forum in which that's going to take place. As I understand it, there is no dispute --maybe there is -- I don't think there is--dispute that **any differences** between the defendant and--who is the principal of Ecuadorian Lines?
>
> MR. KEOUGH: South Pacific
>
> THE COURT: South Pacific Shipping are to be resolved by arbitration... **It seems to me that it would be in everyone's interest, whatever the forum for proceeding, that there be only one forum** and whether that is to be an arbitral forum or to be the court, I would hope that the parties would be able to agree upon that forum and get this matter to final resolution.
>
> **I also think it would be sensible for the parties to do this through arbitration because I think the nature of the dispute is heavily dependent on what is commercially reasonable, and it makes a lot of sense to get a fact finder who has commercial experience.**

*Exhibit 3, at 342-343.* (emphasis supplied).

15.     In response to Judge Lynch's statement that the parties should expeditiously resolve their issues in one arbitration forum before a panel with commercial experience, counsel for NYCT, Mark M. Jaffe, and counsel for South Pacific, John R. Keough III, represented the following on the

record:

> MR. JAFFE: Your Honor, we have recommended arbitration and nominated an arbitrator, an experienced person in this industry.
>
> THE COURT: I understand that. what is the plaintiff's position on that?
>
> MR. KEOUGH: South Pacific is going to respond (sic) that very shortly, Judge, and identify a nominated arbitrator. We expect that will proceed...

*Id.*

16.    Consistent with the representation made by its counsel to Judge Lynch, South Pacific nominated Joseph H. Winer as the second Arbitrator on September 7, 2007, and on September 18, 2007, the two nominated Arbitrators chose Eugene Spitz, Esq., to be the third Arbitrator and Panel Chairman.

17.    All three members of the Panel in the SMA Arbitration have extensive commercial experience in the maritime industry: Eugene Spitz is a graduate of the United States Merchant Marine Academy who sailed as a deck officer on tankers and freighters, later became Admiralty Attorney for Amoco, and was the Vice President of Insurance Claims and Safety for Sea-land for 23 years; David B. Lettany is a graduate of the Maine Maritime Academy who sailed as a deck officer for five years before serving as Vice President of inter-modal operations for Farrell Lines; and Joseph Winer is a professional engineer with a degree in mechanical engineering who had previously sailed as both a licensed and unlicensed member of the crew aboard tanker and dry cargo vessels and was formerly the Vice President of American President Lines.

## THE SMA ARBITRATION

18.    NYCT served and filed its Statement of Claim on March 24, 2008, the essence of

which asserted that NYCT was entitled to reasonable compensation as a result of South Pacific's introduction of "Ocean Class" vessels in January, 2007, which was a change in operation from the previously utilized "Island Class" vessels which had been calling at New York Container Terminal for the prior 7 years . *Exhibit 4, at ¶ 17.*

19.     South Pacific thereafter delayed the SMA Arbitration by refusing to cooperate in discovery concerning internal communications relating to the change in operation, which necessitated three arbitration hearings over the course of 18 months just to address the discovery disputes. *Id.*

20.     On January 31, 2009, the SMA Arbitrators concluded that "its is clear that negotiations were meant by both parties to apply to the then existing service, which had been going on for over five years, and hence there were never any mutually agreed rates at contract extension as respects servicing the Ocean Ships...We accept in principle that the handling of Ocean Ships is different from that of the Island vessels, and that this difference might call for rates different from those previously negotiated during a time when the Island ships were the basis of the service." *Id.*

21.     Arbitration hearings with live witnesses did not commence until March 30, 2010, a full 14 months after the January 31, 2009 ruling.

22.     NYCT commenced its case in chief at a hearing on March 30, 2010, and thereafter on March 31, 2010, April 1, 2010, May 11, 2010, and May 13, 2010, during which time its Accounting Manager, its Director of Marine Operations, two expert witnesses in marine operations, and its President & CEO, James Devine, were called to testify, and all of whom supported NYCT's claim calculation in the principal sum of $3,283,487.93.

23.     South Pacific began presenting its case on May 26, 2010, and over the course of the

next day and a half it called the following witnesses to testify: a marine expert, the President of its

general agent Ecuadorian Line, Inc. ("Ecuadorian"), the Vice President of Ecuadorian, and an ILA

union official.

24.     The parties were unable to complete the examination of Ecuadorian's Vice President

on May 27, 2010, so further hearings to present South Pacific's case were scheduled for mid- July

2010.

25.     However, one week later, on June 4, 2010, South Pacific discharged Mr. Keough and

his law firm, Waesche Sheinbaum, who had represented it in the case for more than three (3) years,

and replaced it with the law firm of Cadwalader, Wickersham & Taft ("Cadwalader"), Joshua Weiss,

Esq., of counsel.

26.     Thereafter, a purported dispute arose between South Pacific and its former counsel,

Waesche Sheinbaum, over a failure to pay counsel fees, and as a result thereof, Waesche Sheinbaum

asserted a lien over the file, which South Pacific refused to bond, in order to permit Cadwalader to

obtain the file and proceed with the SMA Arbitration.

27.     South Pacific used the dispute with its former counsel as an excuse to adjourn the

scheduled July, 2010 hearings, but its dilatory conduct was not lost upon the SMA Panel, which

stated  the following in a July 6, 2010 email to Mr. Weiss: "The panel is not unsympathetic to the

position you find yourself in, but neither is the panel blind to the fact that earlier delays were due to

South Pacific's choice of a very busy single practitioner and are now continuing due to their recent

decision to change Counsel.  Simply stated, the panel feels that it is reasonable to expect that you

will find a way to get these hearings promptly back on track." *Exhibit 5.*

28.     Curiously, while allegedly embroiled in a bitter fee dispute with  Waesche

Scheinbaum which resulted in the suspension of the SMA Arbitration proceedings, South Pacific *still retained that firm*, with Mr. Keough as counsel, in a federal lawsuit before Judge McKenna captioned "Dole Fresh Fruit Company v. South Pacific Shipping Co. Ltd., 10 Civ. 02925;" on August 5, 2010, in the midst of the alleged "fee dispute." Mr. Keough thereafter filed a third party complaint on behalf of South Pacific in that action. *Exhibit 6.*

29.     On June 28, 2010, South Pacific provided notice to NYCT that it would terminate the parties' Agreement. *Exhibit 4, at ¶ 28.*

## THE SECURITY AWARD AND JUDGMENT

30.     On July 6, 2010, NYCT applied to the SMA Panel to compel South Pacific to cooperate in re-scheduling the canceled July hearings and to order South Pacific to provide security for NYCT's claims in the amount of $3,283,487.93, which application was immediately granted by the Panel and thereafter confirmed , after extensive briefing by the parties, in a Partial Final Award dated July 10, 2010. *Id., at ¶¶ 30-37.*

31.     On August 10, 2010, NYCT filed a Petition before the Honorable Richard J. Holwell in the Southern District action, bearing case number 07 Civ. 6317, for an order confirming the SMA Panel's Partial Final Award for Security, and South Pacific cross-moved to vacate the Award.

32.     On December 17, 2010, Judge Holwell, granted the Petition, denied the cross-motion, and ordered South Pacific to post security in the amount of $3,283,487.97; on December 29, 2010, Judge Holwell granted NYCT Partial Judgment on the Order, and further required South Pacific to comply with the directive no later than January 7, 2010. *Exhibit 7.* By mutual agreement of the parties, South Pacific's time to comply with the Court's Partial Judgment was extended to January 14, 2010.

## SMA ARBITRATION RESUMES

33.     Following the delay in the SMA Arbitration occasioned by South Pacific's substitution of counsel, hearings were scheduled to resume on August 24, 2010.

34.     On August 19, 2010, after three years of arbitration, after 10 hearings and the examination of nine (9) witnesses, after NYCT had completed its case in chief, after South Pacific had already presented four (4) witnesses on its defense case, and after the panel had issued a security award in favor of NYCT, South Pacific submitted, for the first time, a "Contingent Counterclaim" to the SMA Panel seeking the following award against NYCT: "at least $4,000,000 representing the monthly cost of servicing the Ocean class vessels and Island Class vessels during the *period January 1, 2000 to September 31, 2005 calculated in the same manner and pursuant to the same metric as any award to Claimant*." *Exhibit 8.* (emphasis supplied).

35.     Under New York law, which applies pursuant to an explicit choice of law provision in the Agreement, contract claims are subject to a six (6) year statute of limitations, and as such, South Pacific's contingent counterclaims accruing prior to August 19, 2004 were time barred. *N.Y.C.P.L.R. § 213 (7)*; *Astro Vencedor Compania Naviera, S.A. v. General Organization for Supply Goods, Cairo,* 1996 WL 22966, at *8 (S.D.N.Y. 1996).

36.     On August 23, 2010, South Pacific's counsel, Mr. Weiss, sent NYCT a **AAA arbitration demand** letter on behalf of its affiliated company, Pacific Fruit, Inc., asserting a $1.5 million claim due to NYCT's alleged breach of the Agreement in "repeatedly charging PF [Pacific Fruit] a higher rate than the contractually agreed rate for stuffing containers that were 'overnighters delivered as FCL;'" Since no further action was ever taken by Mr. Weiss following that demand letter, the claim has apparently been abandoned. In any event, Pacific Fruit had no contractual relationship with NYCT. *Exhibit 9.*

37.    South Pacific resumed the presentation of its defense case in the SMA Arbitration with live witnesses on August 24, 2010.  Additional hearings were thereafter conducted on August 25, 2010, August 26, 2010 and August 27, 2010; during these hearings, South Pacific called a marine expert, Ecuadorian's Director of North East Operations, Pacific Fruit's Vice President of Sales, a former Director of Terminal Operations, and re-called Ecuadorian's Vice President, to present live testimony; these were all the individuals which South Pacific had disclosed would testify on its behalf during the arbitration.

## SOUTH PACIFIC'S BELATED ASSERTION OF COUNTERCLAIMS AND ELEVENTH HOUR REQUEST FOR ADDITIONAL HEARINGS

38.    At the hearing on August 26, 2010, following the testimony of a witness named Darren Decuicies, South Pacific's counsel asserted that, "I believe that we, South Pacific now have a counterclaim for breach of the duty of good faith and fair dealing...as we have now learned that labor was directed away from ECL and in favor of container ships which necessarily caused South Pacific to incur millions of dollars in overtime charges which it had to pay over the course of many, many years, we now intend to file such a counterclaim." *Exhibit 10 at 2400.*

39.    The testimony which gave rise to Mr. Weiss's sudden epiphany that South Pacific now had a counterclaim for breach of good faith and fair dealing, consisted entirely of the following scant and murky exchange with Mr. Decuices:

Q.    On those occasions, who ultimately made the decision to give labor to the container ships instead of Ecuadorian?

A.    That had to be a decision from the top.  You know, a phone calls (sic) was placed to Mr. Devine and a decision came down.  We only have X, which way do we go.  Do that one and finish that one and we will get there when we get there.

Q.    And there were specific instances that you recall where that happened?

11

A.     Yes, there was a specific instance where I recall.

Q.     Is it one or more than one?

A.     One specific that I was involved in but again being involved in hiring the labor and being involved in directing with all of the other directors, I may have not heard the initial phone call but hey, what are we doing, well, we are working over here before we go over here.  Okay, that is the order that  we got.

*Id. at 2386-2389.*

40.     South Pacific therefore based its request  to assert a counterclaim for breach of good faith and fair dealing, encompassing an indeterminate number of years, on nothing more than the testimony of a single individual who alleged that  he witnessed a single instance  of someone making a single decision to discharge a single containership prior to discharging a single South Pacific vessel.

41.     At the fifteenth (15th) and final hearing in the SMA Arbitration, held on November 8, 2010, NYCT's Director of Marine Operations, Joseph Cordero, testified in rebuttal that Mr. Devine's [NYCT's President and CEO] standing order for South Pacific vessels was to turn them "around as quickly and efficiently as possible," that Mr. Decuices was not involved in the allocation of labor, and that Mr. Decuices was dismissed from NYCT because he had been caught selling cargo containers, which he did not own, for personal profit.  *Exhibit 11 at 2626, 2653 and 2661.*

42.     Following South Pacific's expressed intention to assert two counterclaims in the SMA Arbitration, the SMA Panel ruled, on September 23, 2010, as follows:

Gentlemen, this arbitration panel was formed to deal with a contract dispute involving rates applying to the last contract renewal, and several years of intense activity have been conducted on precisely that issue.

Very recently Counsel for South Pacific has clearly indicated that he intends to counter claim for two new and entirely different issues.  Issues that differ in many

respect from the mission of this panel.

The panel has given serious attention to this prospect, and unanimously rules as follows:

The two new claims by South Pacific represent two entirely new issues, **and have no place *as counter claims* in this Arbitration**, though they may be grist for other Arbitrations. Accordingly, Counel are advised that this panel will not consider any submissions, or conduct any hearings, relating to those two planned counter claims.

*Exhibit 12* (emphasis supplied).

43.     The SMA Panel ruled that it would not consider South Pacific's submissions concerning NYCT's alleged diversion of labor and overcharges **as counterclaims**, but it specifically ruled that it would consider those submissions as **defenses** to NYCT's claims.

44.     At the conclusion of the testimony at the November 8, 2010 hearing, the Panel agreed to hear further arguments from the parties as follows:

THE CHAIRMAN: We're back on the record. The panel has caucused and in accordance with the panel's unanimous opinion by email of 11/5/2010, we will hear arguments by South Pacific with regard to the specific issue laid out in that email, which is namely, that the possibility exists that South Pacific may have been put to extra expense in line with the testimony of Mr. DeCuices and this would provide a basis for contesting or setting off same against the extra expense claim being made by New York Container Terminal.

And it goes on further to say we'll not hear any argument or entertain any submissions on what we have described as the other two claims.

*Exhibit 13, at 2800-2801.*

45.     At the November 8, 2010 hearing, the Panel gave Mr. Weiss the opportunity to argue his position on behalf of South Pacific, and he stated, *inter alia*, the following:

MR. WEISS: Thank you. As we lay out in our letter, our claims, or our claim now, the one that you are considering, which is our claim that the actions of New York Container Terminal actually caused, one, a decrease in productivity, and two,

13

increased costs to Ecuadorian Line, regardless of how they're characterized, whether it's a counterclaim or not, it is undeniably equally fair to characterize that set of circumstances as a claim for what the law deems to be equitable recoupment or setoff, which we set in our letter, either one, is a transaction which arises out of the same contract or set of circumstances, or where two parties have offsetting claims against one another...

I think that the claims, as a result of the fact that I don't think one could reasonably contest that they are equitable recoupment or setoff, lead to the conclusion that we have a right to present these defenses, and if we are not entitled to present these defenses we have been denied or will have been denied due process, or fundamental fairness as the law defines in in the context of enforcing arbitration awards.

**These are defenses like any other defense, and we are entitled to present them, we need to present them.**

*Id., at 2801-2805.* (emphasis supplied).

46.     In ruling on Mr. Weiss's application at the November 8, 2010 hearing, the Panel

stated the following:

THE CHAIRMAN:     The Panel at no time suggests you don't have a claim for your argument that you were overcharged initially, the changeout, or that you may have been mistreated after the injunction was received.

But those are separate claims **if they do anything other than deal with the issue that's been paramount throughout, which is is New York Container Terminal entitled to any additional recovery for extra cost.**

You can set forth anything you want to in regard to your rights, but the panel has ruled that those are two separate claims and they're not part of this arbitration. **Now to the extent that you can relate that to a reduction in the claims that they are asking for, that's totally appropriate and we will listen to that.**

*Id, at 2819-2820* (emphasis supplied).

47.     After Mr. Weiss requested permission for additional  hearings beyond the 15 which

had already been conducted over the prior three years, the Panel denied the application and stated

the following:

THE CHAIRMAN: How long have you been counsel on this?

MR. WEISS: I have been counsel on this case since approximately May of this year.

THE CHAIRMAN: *And you're just now concerned with developing this evidence?*

*Id. at 2822 (emphasis supplied).*

48.     It is clear that on November 8, 2010 the Panel ruled that it would consider South

Pacific's **defenses**, whether NYCT either caused its own loss in productivity by diverting labor or

would not be entitled to a recovery due to overcharges arising  from the initial change out of the

vessels; however, what  the Panel would not consider were South Pacific's **counterclaims** for

alleged losses beyond what could be  offset against a potential recovery in favor NYCT, nor would

it allow Mr. Weiss to further prolong what had already been an unduly protracted arbitration

proceeding.

49.     Therefore, the issues of whether NYCT diverted labor or whether South Pacific was

overcharged *are presently* before the SMA Panel and *will necessarily* be adjudicated when the Panel

renders its final decision.

## SOUTH PACIFIC ATTEMPTS TO CIRCUMVENT THE AUTHORITY OF THE SMA PANEL BY COMMENCING A RIVAL ARBITRATION

50.     On December 15, 2010 South Pacific's counsel sent NYCT a demand for arbitration

before the American Arbitration Association ("AAA") alleging  the following claims:

- NYCT wrongfully overcharged for the stuffing of reefer containers, to the extent of at least $1.5 million, in breach of the applicable agreement;

- NYCT diverted labor away from ships managed by SP and failed to provide adequate labor to such ships wrongfully causing SP to incur millions of dollars in overtime payments;

- NYCT wrongfully charged for waste disposal and handling, to the extent of at least $230,000;

- In the event that NYCT obtains an award against SP in respect of its claims currently being arbitrated before an SMA panel, SP asserts it Contingent

15

Counterclaim, as described in its August 19, 2010 submission to the SMA panel.

*Exhibit 14.*

51.     Each and every one of the four claims contained in South Pacific's AAA arbitration demand were actively and forcefully arbitrated for three years during the 15 SMA hearings, are under consideration by the SMA Panel, will necessarily be adjudicated by the SMA Panel when it decides the case, and are therefore unquestionably within the sole arbitral authority of the SMA panel.

*AAA claim that NYCT overcharged for stuffing reefer containers*

52.     South Pacific's allegation that NYCT overcharged for stuffing reefer containers was a sharply disputed factual issue that was the subject of substantial testimony adduced over the course of four hearings in the SMA Arbitration, as illustrated in the following hearing transcripts: April 1, 2010 at pages 664 and 738-750; May 11, 2010 at pages 815, 838-839, 894, 915, 944, and 1023-1026; May 27, 2010 at pages 1515-1516, 1581, and 1614-1615; August 26, 2010 at pages 2256, 2266-2270, 2353-2354, and 2390-2394. *Exhibit 15.*

53.     An example of the extent to which the parties arbitrated the issue of the reefer containers is the following testimony from South Pacific's direct examination of Darren Decuices on August 26, 2010:

> Q. At some point did Mr. Stamatis make a request regarding the rates that would be applied to stuffing containers?
>
> A.     Yes. There was a conversation Mr. Stamatis and I had and at one point Mr. Stamatis and Mr. Devine had a conversation in the allway abuot it and then Mr. Devine approached me and I said yes, we could help them out with this situation.
>
> It was a rough period, it was getting summertime and it was kind of getting congested. And we kind of broke the rate down in a half figure type of thing because Mr. Stamatis had requested they he was trying to sell most of the containers that we were putting the fruit into at night.

16

> So instead of bringing them back and taking the fruit out, if he could sell it as a full container right out the door, there would be no second handling and we would go with a one way rate.

*Id. at 2390-2394.*

54.     The foregoing demonstrates that South Pacific arbitrated the defense arising from alleged overcharging for reefer containers, and as such, that issue is under consideration by the SMA Panel, will necessarily be adjudicated by the SMA Panel when it decides the case, and is therefore unquestionably within the sole arbitral authority of the SMA panel.

*AAA claim that NYCT diverted labor and caused its own decline in productivity*

55.     South Pacific's allegation that NYCT caused its own decline in productivity by diverting labor from South Pacific Ships to other container ships was a sharply disputed factual issue that was repeatedly argued throughout the SMA proceeding, and was the subject of both multiple Panel rulings and testimony adduced over the course of 10  hearings, as illustrated in the following hearing transcripts: October 15, 2008 at pages 17 and 52; March 31, 2010 at pages 410-418; May 11, 2010 at page 1032; May 13, 2010 at pages 1059-1067, 1105-1111, 1140-1141, 1190-1196, 1201, and 1211; May 26, 2010 at pages 1377, and 1418-1420; May 27, 2010 at pages 1489-1495, and 1500-1511; August 24, 2010 at pages 1915-1917, and 1982; August 25, 2010 at page 1992; August 26, 2010 2383-2385; and November 8, 2010 at page 2665. *Exhibit 16.*

56.     The allegation that NYCT diverted labor was even  raised by South Pacific's former counsel, John Keough, at the *very first arbitration hearing* on October 15, 2008, a fact which severely undercuts South Pacific's assertion that it did not know it had such a claim until Mr. DeCuices testified on August 26, 2010:

MR. KEOUGH:...We know that NYCT prefers to deal with the new containership customers. They have encouraged that business. They have brought those large container vessel customers into the terminal and they are devoting the labor that had been working the Ecuadorian Line Ships now to the new containerships, but NYCT can't shift its problems to Ecuadorian Line by breaching its contract.

*Id., October 15, 2008 transcript, at 17.*

57.     The foregoing demonstrates that South Pacific actively arbitrated its defense that NYCT allegedly diverted labor, and as such, that issue is under consideration by the SMA Panel, will necessarily be adjudicated by the SMA Panel when it decides the case, and is therefore unquestionably within the sole arbitral authority of the SMA panel.

*AAA claim that NYCT wrongfully charged for waste disposal and handling*

58.     South Pacific's allegation that NYCT wrongfully overcharged for waste disposal and handling was a sharply disputed factual issue that was arbitrated by South Pacific in the SMA proceeding and was the subject of testimony adduced at the May 4, 2010 hearing,  as illustrated at pages 873-879 and page 992 of the transcript. *Exhibit 17.*

59.     South Pacific actively arbitrated its defense that NYCT allegedly wrongfully charged for waste disposal and handling, and as such, that issue is under consideration by the SMA Panel, will necessarily be adjudicated by the SMA Panel when it decides the case, and is therefore unquestionably within the sole arbitral authority of the SMA panel.

*AAA claim that South Pacific's "Contingent Counterclaim"*
*in the SMA Arbitration should be decided by a AAA panel*

60.     South Pacific's allegation that NYCT should provide a refund for rates charged between 2000 and 2005 when the Island Class vessels were discharging at New York Container Terminal issue was an issue that was repeatedly argued throughout the SMA proceeding, and was the subject of multiple Panel rulings and testimony adduced at the May 11, 2010 hearing, as

18

illustrated in the hearing transcript at pages 912-914.  *Exhibit 18.*

61.    The allegation that NYCT should provide a refund for rates charged between 2000 and 2005 was first raised by South Pacific's former counsel, John Keough, at the very first arbitration hearing on October 15, 2008, a fact which severely undercuts South Pacific's argument that the SMA Panel's refusal to hear the "Contingent Counterclaim" when it was first submitted two years later after was fundamentally unfair:

> MR. KEOUGH: The panel will recall that the contracts rates covered the ocean vessels at the outset of this contract.  NYCT did not complain then that the contract rates were too generous when the island vessels replaced the ocean vessels and began falling under the same rates.
>
> Under a theory that different rates could apply to island and ocean class vessels now, logic would require that NYCT refund to South Pacific the charges for the island vessels during the early years fo the contract since they were allegedly easier to discharge and handle.

*Exhibit 16, October 15, 2008 transcript at 52.*

62.    The foregoing demonstrates that South Pacific actively arbitrated its defense that NYCT allegedly owed a refund on South Pacific's  "Contingent Counterclaim,"  and as such, that issue is under consideration by the SMA Panel, will necessarily be adjudicated by the SMA Panel when it decides the case, and is therefore unquestionably within the sole arbitral authority of the SMA panel.

## AS AN FOR A FIRST CAUSE OF ACTION
## (FEDERAL ARBITRATION ACT)

63.    Petitioner repeats and re-alleges paragraphs "1" through "62" of this Verified Petition as if more fully set forth at length herein.

64.    The terminal and stevedoring Agreement entered into between NYCT and South Pacific is a maritime contract governed by the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.* ("FAA")

and  New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9

U.S.C. § 201, *et seq.* (The "New York Convention"), the policy of which  is to ensure that private

agreements to arbitrate are enforced according to their terms

65.     Since a district court is empowered to compel arbitration proceedings under the FAA,

it may also preserve the integrity of those proceedings by enjoining later-filed rival arbitrations that

arise out of the same controversy.  *See Jock v. Sterling Jewelers, Inc.*, 2010 WL 5158617, at *3

(S.D.N.Y. 2010).

66.     South Pacific's commencement of AAA arbitration was undertaken to circumvent

the authority of the SMA Panel and to subvert the SMA Arbitration which NYCT filed and arbitrated

in strict conformity with the arbitration provisions in the Agreement, and as such it constitutes a

breach of said Agreement.

67.     The Agreement's arbitration provisions specifically incorporate the Rules of the

Society of Maritime Arbitrators, which includes the following provision at Section 2 therein:

> The parties agree to consolidate proceeding relating to contract disputes with other
> parties which involve common questions of fact or law and/or arise in substantial part
> from the same maritime transactions or series of related transactions, provided all
> contracts incorporate SMA Rules.

*Exhibit 19.*

68.     South Pacific's commencement of a rival AAA arbitration constitutes a violation of

Section 2 of the Rules of the Society of Maritime Arbitrators.

69.     The Agreement specifically provides that in any arbitration between the parties," the

arbitrators shall be commercial people, conversant with shipping matters," yet South Pacific's

demand for arbitration seeks to appoint arbitrators whose only qualifications are that they are

"attorneys or former judges with commercial litigation experience," and as such, the AAA demand is in breach of the parties' arbitration agreement.

70.     For the foregoing reasons, NYCT is entitled to an order staying the AAA arbitration permanently, or alternatively, staying the AAA arbitration until after the SMA Panel has rendered a decision in the SMA arbitration.

## AS AND FOR A SECOND CAUSE OF ACTION
### (NEW YORK LAW)

71.     Petitioner repeats and re-alleges paragraphs "1" through "70" of this Verified Petition as if more fully set forth at length herein.

72.     The Agreement contains a valid choice of law provision which states that "the laws of the State of New York shall be applicable to and govern all claims, actions or disputes that may arise under this agreement."

73.     South Pacific's demand for AAA arbitration specifically referenced Article 75 of New York's Civil Practice Law and Rules ("CPLR").

74.     Under New York law, a party who has not participated in the arbitration and who has not made or been served with an application to compel arbitration, may apply to stay arbitration on the ground that a valid agreement has not been complied with or that the claim sought to be arbitrated is barred by limitation.  CPLR § 7503.

75.     NYCT has not been served by South Pacific with an application to compel arbitration, nor has NYCT participated in the AAA arbitration.

76.     This Petition to Stay Arbitration is timely under CPLR § 7503.

21

77.    South Pacific's commencement of AAA arbitration constitutes an act of non-compliance with the Agreement.

78.    South Pacific's "Contingent Counterclaim," as set forth in its AAA arbitration demand, is time barred under New York's six year statute of limitations. C.P.L.R. 213(7).

**WHEREFORE**, Petitioner respectfully requests that an order and/or judgment be entered against Respondent and in favor of Petitioner

(1 ) permanently staying South Pacific's AAA arbitration, or alternatively, temporarily staying South Pacific's AAA arbitration until the SMA Panel has rendered a decision.

(2) holding that South Pacific's claims as set forth in its Contingent Counterclaim are time barred, in whole or in part.

(3) adjudging and decreeing that Respondent pay Petitioner's counsel fees and expenses in the prosecution of this case,

(4) adjudging and decreeing that Respondent pay Petitioner's costs, disbursements and legal interest in an amount to be determined by the Court, and

(5) granting Petitioner such other, further and different relief as this Court may deem just and proper.

Dated: New York, New York on January 13, 2011

Respectfully submitted,

JUNGE & MELE, LLP
*Attorneys for Petitioner*

By: _____

Peter A. Junge
Armand P. Mele
250 West 57th Street, Suite 2532
New York, NY10107
(212) 269-0061
attorneys@junge-mele.com

## VERIFICATION

I, Pet Peter A. Junge er A. Junge, verify that the contents of this Petition are true based upon personal knowledge, except as to matters based on information and belief, and as to them I believe them to be true.

This verification is made by the undersigned and not by Petitioner since Petitioner does not maintain an office in the county or district where my office is located. Furthermore, I verify that all the documentary exhibits provided in this Petition are true copies of the originals.

I declare under penalty of perjury that the above is true and correct.

Dated: New York, New York on January 13, 2011

Peter A. Junge

23